U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2011 OCT 20 PM 2:08

CLERK
BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA,)
)
v. ) Case No. 5:11-cr-14
)
OSCAR ENRIQUE FUNEZ-PINEDA, )
)
Defendant. )

**OPINION AND ORDER DENYING DEFENDANT'S MOTIONS
TO DISMISS THE INDICTMENT AND SUPPRESSION OF EVIDENCE**
(Doc. 17)

This matter came before the court on August 18, 2011 for oral argument on Defendant Oscar Enrique Funez-Pineda's Fed. R. Crim. P. 12(b)(2) motion to dismiss the Indictment against him and to suppress evidence based on an illegal traffic stop. (Doc. 17.) Defendant is charged with criminal reentry after removal after having committed an aggravated felony in violation of 8 U.S.C. § 1326(a). The parties completed their post-hearing briefing on September 8, 2011.

Defendant argues that the traffic stop leading to his arrest was not based on a reasonable suspicion of criminal activity, and the court should therefore suppress all evidence resulting from it.

In his motion to dismiss, Defendant seeks to collaterally attack his underlying removal order pursuant to 8 U.S.C. § 1326(d). He contends that Immigration and Customs Enforcement ("ICE") erroneously determined that he had been convicted of an aggravated felony, thus triggering his expedited removal, which he argues was fundamentally unfair. He also argues that he was denied an opportunity to exhaust his administrative remedies and obtain judicial review of his removal order. The Government opposes both motions.

The Government is represented by AUSA Wendy L. Fuller. Defendant is represented by Steven L. Barth, Esq.

I.  **Defendant's Motion to Suppress.**

A. **Findings of Fact.**

Based upon admissible evidence, the court makes the following findings of fact. On Sunday, February 13, 2011, U.S. Border Patrol Agent Joshua Hartness[1] was on routine patrol in his marked Border Patrol vehicle. There was no precipitation that day, and the temperature was cold.

At approximately 5:00 a.m., Agent Hartness was patrolling a remote section of Route 114 in Norton, Vermont. The population of the towns in this area is low, particularly in the winter, with Warren's Gore having a population of two, Norton having a population of approximately 100, and Averill having approximately fifteen year-round residents. There is one restaurant in the area, no hotels, and only two gas stations, but none was open at the time of the traffic stop.

Route 114 runs northerly until it nearly intersects with the border, and then it travels east to follow the border. Eventually it leads to a port of entry which is manned and equipped with cameras. Additionally, Route 114 runs parallel to north-south train tracks, which Border Patrol has identified as a smuggling route. Although Agent Hartness had never personally detained anyone at this location, Border Patrol is aware of people coming in from Canada at this location in order to bypass a port of entry. The railroad tracks are lined with brush and trees concealing them from view from Route 114. Agent Hartness opined that the railroad bed serves as a location for drop-offs because a person need only follow the train tracks to cross into Canada.

Nelson Road is the only road in that area that does not have a port of entry facility on it, and thus it is not "manned." It also crosses directly under the railroad bridge. Border Patrol agents are able to view vehicles arriving in the United States on Nelson Road; however, the area under the railroad bridge is a blind spot.

---

[1] Agent Hartness works for U.S. Border Patrol at the Beecher Falls, Vermont outpost. His territory covers northeastern Vermont. Before starting his current position approximately two years ago, Agent Hartness was part of a roving patrol in Texas. He is trained to pay attention to areas close to the border, particularly those that are wooded or concealed.

In the early morning hours of February 13, 2011, Agent Hartness observed a white work van with Maryland plate number 34379M9 driving north approximately two miles south of Gagnon Road from his stationary position in a pull-off area on Route 114. The van had a ladder on the roof, and no windows on the rear sides. There were, however, windows on the back doors. The vehicle was traveling at approximately five to ten miles per hour, as if the operator were approaching an area in which he or she might stop. Agent Hartness pulled out behind the van and was able to gauge the van's speed by checking his speedometer. Due to the darkness of the morning and lack of lights in the area, he was unable to see the van's operator. He could read the numbers on the license plate, and once he determined it was a Maryland plate, he asked dispatch to run the plate. Dispatch reported nothing suspicious.

In Agent Hartness's experience, it was "very odd" to have a Maryland work van, a "prime smuggling vehicle," driving in an area of sparse population and minimal traffic in Northern Vermont in the early hours of the morning. In Agent Hartness's experience, vehicles that do travel at that time and place tend to have Vermont plates, although Border Patrol agents have pulled over vehicles from Maine, New Hampshire, and Canada in this area.

Agent Hartness followed the vehicle for two miles (approximately ten minutes) and effectuated a stop at the intersection of Route 114 and Gagnon Road, which was the first safe location to pull over. Prior to the stop, Agent Hartness noticed that the van did not activate its directional signals or vary its speed.[2]

After Agent Hartness stopped the van, Defendant, who was a passenger in the vehicle, was arrested and taken into custody.

### B. Conclusions of Law and Analysis Regarding Defendant's Motion to Suppress.

Defendant seeks suppression of all evidence stemming from Agent Hartness's traffic stop, alleging Agent Hartness lacked a reasonable suspicion of criminal activity to

---

[2] Additionally, the van did not appear to be laden with excess weight, and Border Patrol had no record of this van being used for smuggling operations in the past.

3

effectuate a stop. The Government opposes suppression, arguing the stop was lawful under *Terry v. Ohio*, 392 U.S. 1 (1968).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. CONST. amend. IV. In *Terry v. Ohio*, the Supreme Court held that a police officer can stop and briefly detain a person if the officer has a reasonable suspicion "that criminal activity may be afoot." *Id.* 392 U.S. at 30.

The Second Circuit has characterized the quantum of suspicion necessary to make a traffic stop as a "reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (internal citation and quotation marks omitted). "[T]he concept of reasonable suspicion is not susceptible to precise definition." *United States v. Glover*, 957 F.2d 1004, 1009 (2d Cir. 1992). Nevertheless, it is clear that "some minimal level of objective justification" is required, *id.* at 1009-10 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)), and that "inchoate suspicion or mere hunch" is an insufficient basis for a stop. *Glover*, 957 F.2d at 1010. Reasonable suspicion is an objective standard, and therefore the officer's subjective intentions or motives are irrelevant. *See Glover*, 957 F.2d at 1010. "Although an officer's reliance on a mere 'hunch' is insufficient, . . . the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citing *Terry* and *Sokolow*).

When evaluating the reasonableness of a *Terry* stop, the reviewing court must consider "the totality of the circumstances" surrounding the stop. *Sokolow*, 490 U.S. at 8 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). The court evaluates those circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Oates*, 560 F.2d 45, 61 (2d Cir. 1977); *Terry*, 392 U.S. at 27 ("[I]n determining whether the officer acted reasonably[,] . . . due weight must be given . . . to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.").

An officer may consider a number of factors in deciding whether to stop a vehicle including the characteristics of the area, "[i]ts proximity to the border, the usual patterns of traffic on the particular road, and previous experience with alien traffic[.]" *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975); *United States v. Sugrim*, 732 F.2d 25, 30 (2d Cir. 1984) (concluding proximity to the border at a location where illegal aliens entering the country are known to congregate, as well as suspect's mode of dress and officer's experience in detecting illegal entry may support a reasonable and articulable suspicion of illegal entry). Officers may also consider "information about recent illegal border crossings in the area," the driver's behavior, such as "erratic driving or obvious attempts to evade officers," the type and characteristics of the vehicle itself, and whether it is heavily loaded. *Id.* at 885 (internal citations omitted).

In this case, Agent Hartness did not observe the operator of the vehicle, nor did he see the operator commit any traffic violations. A record check on the license plate did not return any suspicious information. Additionally, Agent Hartness did not observe that the van was carrying excess weight.

On the other hand, the work van's status as a vehicle associated with smuggling, its out-of-state plates, its presence in a sparsely populated area of Vermont with no local attractions and with no discernable purpose, the early time of day, the van's prolonged slow speed, and the proximity of Route 114 in Norton to the border all contribute to a reasonable suspicion that the van's operator may have been engaged in smuggling activity and was looking for a place to pick up or drop off a person or contraband. *See United States v. Lopez-Martinez*, 25 F.3d 1481, 1486 (10th Cir. 1994) (finding reasonable suspicion of unlawful conduct to stop a car in a border area where agent observed two cars driving closely together at a speed well below the speed limit on an empty road known to be used for avoiding a border patrol checkpoint); *United States v. Barbee*, 968 F.2d 1026, 1029 (10th Cir. 1992) (concluding presence of out-of-state license plate from neighboring state can contribute to finding of reasonable suspicion of criminal activity to justify stopping a vehicle).

In analyzing the relevant facts, the court regards them from the perspective of a trained Border Patrol agent. *See United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991) (finding reasonable suspicion where "suspicious" conduct observed by "one familiar with the practices of [persons illegally crossing the border]" would have been "innocuous to the untrained observer"); *Oates*, 560 F.2d at 61 (recognizing that "some patterns of behavior which may seem innocuous enough to the untrained eye may not appear so innocent to the trained police officer who has witnessed similar scenarios numerous times before."); *United States v. Avalos-Ochoa*, 557 F.2d 1299, 1301-02 (9th Cir. 1977) ("Among the facts which an officer can consider in formulating such reasonable suspicion are . . . the officer's experience in detecting illegal entry and smuggling."): *see also United States v. Sharpe*, 470 U.S. 675, 686 (1985) (instructing courts not to "indulge in unrealistic second-guessing" as to the means law enforcement officers employ to conduct their investigations when determining whether law enforcement officers had a reasonable, articulable suspicion of criminal activity); *United States v. Adoni-Pena*, 2009 WL 3568488, at *3 (D. Vt. Oct. 23, 2009) (quoting *Sharpe*).

On balance, although a close question, the totality of the circumstances in this case supports a conclusion that there are sufficient specific objective and articulable facts to lead an experienced border patrol agent to reasonably suspect that the van's operator was engaged in or about to be engaged in illegal activity. *See United States v. Nargi*, 732 F.2d 1102, 1105 (2d Cir. 1984) (internal citation omitted) (concluding an officer "must be aware of specific, objective and articulable facts giving rise to a reasonable suspicion that the suspect is, was, or is about to be engaged in criminal activity" before stopping a vehicle). Accordingly, the evidence obtained as a result of the van's and its occupants' seizure was the product of a lawful *Terry* stop and no Fourth Amendment violation occurred.

For the reasons stated above, the court hereby DENIES Defendant's motion to suppress evidence.

## II. Defendant's Motion to Dismiss.

### A. Factual and Procedural Background.

In his motion to dismiss, Defendant challenges his removal order, arguing that the characterization of his conviction as an "aggravated felony" was erroneous as a matter of law and thus fundamentally unfair.

On July 16, 2007, Defendant pled guilty in Colorado to attempted sexual assault on a child by one in a position of trust in violation of C.R.S. § 18-3-405.3(1). ICE concluded that Defendant was illegally present in the United States and classified his conviction as an aggravated felony, thus making him deportable under 8 U.S.C. § 1227(a)(2)(a)(iii). On February 19, 2008, Defendant was issued two Notices of Intent to Issue a Final Administrative Order (the "Notices of Intent"), which informed him in English that the Department of Homeland Security intended to issue a final administrative removal order without a hearing before an Immigration Judge ("IJ"), pursuant to the expedited removal proceedings set forth in 8 U.S.C. § 1228(b).

The Notices of Intent stated that Defendant had ten days to respond to the charges, and included boxes to check if he wished to "contest and/or request withholding or removal." On the second page of the Notices of Intent, Defendant was advised that he could contest removal if he met one of the following conditions: (1) he was a United States citizen; (2) he was a lawful permanent resident of the United States; (3) he had not been convicted of the criminal offense listed in the allegations section; (4) he feared persecution in the country of deportation; or (5) he feared torture in the country of deportation. Defendant did not check any of these boxes. He did, however, check boxes waiving his "right to rebut and contest the [] charges" or to "request withholding or deferral of removal." The Government concedes that it cannot prove that Defendant understood English at the time he received the Notices of Intent, and Defendant contends that he did not.

On March 25, 2008, Defendant was physically removed from the United States and returned to Honduras.

7

On March 3, 2011, the Government filed a one count Indictment alleging Defendant violated 8 U.S.C. § 1326(a) because he is an alien who was found in the United States after having been deported and removed subsequent to the commission of an aggravated felony, without the consent of the Attorney General to reapply for admission to the United States.

### B. Conclusions of Law and Analysis Regarding Defendant's Motion to Dismiss.

#### 1. Requirements for a Collateral Attack on the Indictment.

Defendant moves to dismiss the Indictment pursuant to 8 U.S.C. § 1326(d), claiming the Indictment is unlawful because it is predicated on an unlawful removal order. *See United States v. Copeland,* 376 F.3d 61, 66 (2d Cir. 2004) ("An alien can defend against such a charge by challenging the validity of the deportation order upon which the charge is predicated."). Section 1326 of Title 8 permits an alien charged with illegal reentry under 8 U.S.C. § 1326(a) "to challenge the underlying deportation order on which the illegal reentry charge is based." *United States v. Lopez,* 445 F.3d 90, 94 (2d Cir. 2006) (citation omitted). Section 1326(d) codified the Supreme Court's holding in *United States v. Mendoza-Lopez,* 481 U.S. 828 (1987), wherein the Court stated that "where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding." *Id.* at 837-38 (citation omitted).

Congress has limited the circumstances in which a collateral attack on an underlying removal order is available as follows:

> In a criminal proceeding [for illegal reentry], an alien may not challenge the validity of the deportation order . . . unless the alien demonstrates that
>
> > (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
> >
> > (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

8

(3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d). "The requirements are conjunctive, and thus [a defendant] must establish all three in order to succeed in his challenge to his removal order." *United States v. Fernandez-Antonia,* 278 F.3d 150, 157 (2d Cir. 2002).

Defendant asserts that he has established all three prongs of § 1326(d). The Government contends that he has established none of them, although the Government concedes that it cannot prove Defendant was informed of his rights in a language that he understood. The crux of Defendant's motion is whether entry of his removal order was fundamentally unfair, and thus the court begins its inquiry there.

### 2. Section 1326(d)(3): Whether Defendant's Removal was Fundamentally Unfair.

Under § 1326(d)(3), a defendant must establish that the entry of his removal order was fundamentally unfair. Where the Board of Immigration Appeals ("BIA") erroneously classifies an alien's conviction as an "aggravated felony," the court must vacate the underlying removal order. *See Covarrubias Teposte v. Holder,* 632 F.3d 1049, 1055-56 (9th Cir. 2011) (concluding California statute was not categorically a "crime of violence" pursuant to definition in 18 U.S.C. § 16, as adopted by the BIA, and vacating defendant's order of removal); *Jimenez-Gonzalez v. Mukasey,* 548 F.3d 557, 562-63 (7th Cir. 2008) (holding defendant's conviction for criminal recklessness did not constitute a "crime of violence" supporting his aggravated felony-based removal).

In this case, Defendant contends that ICE erred when it determined that his conviction of attempted sexual assault on a child by a person in a position of trust constituted a conviction of an "aggravated felony" pursuant to 8 U.S.C. § 1101(a)(43)(A), and that he was prejudiced by this error because he was unlawfully removed. Thus, the court must first determine whether, at the time of his 2008 removal, Defendant had been convicted of an "aggravated felony." *See id.* §§ 1227(a)(2)(A)(iii), 1229c(a), (b).[3]

---

[3] The Government argues that any error in characterizing Defendant's conviction as an "aggravated felony" for sexual abuse of a minor under 8 U.S.C. § 1101(a)(43)(A) is harmless because Defendant was deportable on the alternative ground that his conviction constitutes an

9

"Any alien who is convicted of an aggravated felony at any time after admission is deportable." *Id.* § 1227(a)(2)(A)(iii). An "aggravated felony" is a deportable offense and includes "murder, rape or sexual abuse of a minor." *Id.* § 1101(a)(43)(A). It also includes "an attempt or conspiracy to commit an offense described" elsewhere in § 1101(a)(43). 8 U.S.C. § 1101(a)(43)(U).

In determining what constitutes sexual abuse of a minor under 8 U.S.C. § 1101(a)(43)(A), the BIA adopted the definition of "sexual abuse" found in 18 U.S.C. § 3509. *See In re Rodriguez-Rodriguez*, 22 I. & N. Dec. 991, 994-96 (BIA 1999); *Mugalli v. Ashcroft*, 258 F.3d 52, 60 (2d Cir. 2001). The Second Circuit directs trial courts to give *Chevron*[4] deference to BIA's adoption of the definition of "sexual abuse" found in 18 U.S.C. § 3509 in determining what constitutes "sexual abuse of a minor" under 8 U.S.C. § 1101(a)(43)(A). *See Mugalli*, 258 F.3d at 55 (deferring to the BIA's

---

"aggravated felony" because it was a "crime of violence" pursuant to 8 U.S.C. § 1101(a)(43)(F). Under 8 U.S.C. § 1101(a)(43)(F), a "crime of violence" is restricted to a crime "for which the term of imprisonment [is] at least one year[.]" Defendant does not contest that he was convicted of a felony, but he contends that his conviction does not satisfy § 1101(a)(43)(F) because he was not sentenced to a term of imprisonment of at least one year. "[T]he actual term imposed is ordinarily the definitional touchstone." *United States v. Pacheco*, 225 F.3d 148, 154 (2d Cir. 2000) (internal citation omitted); *see also Alberto-Gonzalez v. I.N.S.*, 215 F.3d 906, 909 (9th Cir. 2000) ("Congress appears to have used the phrase 'term of imprisonment' to specifically refer to the actual sentence imposed. This precise distinction implies that Congress was aware of the difference between the statutory maximum penalty and the sentence actually imposed."); *Shaya v. Holder*, 586 F.3d 401, 408 (6th Cir. 2009) (examining Michigan law and concluding the "term of imprisonment" for defendant's conviction is the longer of the minimum sentence applied and the time actually served); *United States v. Andino*, 148 Fed. App'x 828, 830 n.2 (11th Cir. 2005) (noting the "term of imprisonment" requirement in § 1101(a)(43)(F) "requires that the sentence actually imposed be at least one year"). Because the Government has failed to establish that the that Defendant's conviction qualifies as a "crime of violence" pursuant to 8 U.S.C. § 1101(a)(43)(F), its alternative argument must fail.

[4] *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) (requiring reviewing courts to defer to an agency's interpretation of the statute it administers when the intent of Congress is unclear and the agency's interpretation is reasonable).

10

interpretation of the phrase "sexual abuse of a minor"); *Oouch v. U.S. Dept. of Homeland Sec.*, 633 F.3d 119, 122 (2d Cir. 2011) (citing *Mugalli*).[5]

Under 18 U.S.C. § 3509(8), "sexual abuse" is defined as "includ[ing] the employment, use, persuasion, inducement, enticement, or coercion of a child to engage in, or assist another person to engage in, sexually explicit conduct or the rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children." *Id.* The phrase "sexually explicit conduct" is broadly defined to include "actual or simulated . . . sexual intercourse, including sexual contact in the manner of genital-genital, oral-genital, anal-genital, or oral-anal contact, whether between persons of the same or of opposite sex." *James v. Mukasey*, 522 F.3d 250, 254 (2d Cir. 2008) (internal citations and quotation omitted). "[T]he term 'child' as used in section 3509[] includes persons under the age of eighteen who are victims of sexual abuse." *Ganzhi*, 624 F.3d at 28; 18 U.S.C. § 3509(a)(2). Sexual abuse of a minor under § 3509 requires only that the actor "(1) engage in any one of a number of proscribed sexual acts, . . . (2) with a person under the age of eighteen[.]" *Ganzhi*, 624 F.3d at 30.

In this case, Defendant was convicted of violating C.R.S. § 18-3-405.3, which states:

> Any actor who knowingly subjects another not his or her spouse to any sexual contact commits sexual assault on a child by one in a position of trust if the victim is a child less than eighteen years of age and the actor

---

[5] Defendant argues that this court should decline to follow *Oouch* because it was decided incorrectly based on the holding in *Estrada-Espinoza v. Mukasey*, 546 F.3d 1147, 1157 (9th Cir. 2008). In that case, the Ninth Circuit adopted the definition of "sexual abuse of a minor" found in 18 U.S.C. § 2243 and concluded that a California statutory rape statute did not qualify as an aggravated felony under 18 U.S.C. § 2243. *See Estrada-Espinoza*, 546 F.3d at 1158-60. *Estrada-Espinoza* is contrary to Second Circuit precedent under *Oouch* and *Ganzhi v. Holder*, 624 F.3d 23, 28 (2d Cir. 2010), both of which granted *Chevron* deference to BIA's decision to adopt the definition of "sexual abuse" as stated in 18 U.S.C. § 3509. Indeed, the *Oouch* court specifically declined the defendant's request to follow the *Estrada-Espinoza* decision. *Oouch*, 633 F.3d at 122. Furthermore, the Ninth Circuit has limited the holding of *Estrada-Espinoza* to statutory rape cases only. *See United States v. Valencia-Barragan*, 608 F.3d 1103, 1107 n.2 (9th Cir. 2010) (internal citations omitted) ("Although *Estrada-Espinoza* referred to those elements as defining 'sexual abuse of a minor' generally, we subsequently clarified that the *Estrada-Espinoza* definition 'encompassed statutory rape crimes only.'").

> committing the offense is one in a position of trust with respect to the victim.

"Sexual contact" is defined as:

> the knowing touching of the victim's intimate parts by the actor, or of the actor's intimate parts by the victim, or the knowing touching of the clothing covering the immediate area of the victim's or actor's intimate parts if that sexual contact is for the purposes of sexual arousal, gratification, or abuse.

C.R.S. § 18-3-401(4). Under Colorado law, the age of consent is eighteen. *See United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005); *People v. Leske*, 957 P.2d 1030, 1039 (Colo. 1998) (stating "a person under the age of eighteen is a child"); C.R.S. § 18-3-404(g)(1.5) (stating a "child" is any person under the age of eighteen years for purposes of the sexual assault statute).

The Second Circuit utilizes a categorical approach to determine whether an alien's conviction renders him or her removable as an aggravated felon. *See Martinez v. Mukasey*, 551 F.3d 113, 118 (2d Cir. 2008). This approach "looks to the elements of the penal statute rather than the particulars of the alien's conduct." *Oouch*, 633 F.3d at 122 (citing *Taylor v. United States*, 495 U.S. 575, 602 (1990)); *Ganzhi*, 624 F.3d at 27 (internal citations omitted). The court must determine whether "every set of facts violating a statute" satisfies the criteria for removability by looking to the "minimum criminal conduct necessary for a conviction." *Ganzhi*, 624 F.3d at 27 (quoting *Abimbola v. Ashcroft*, 378 F.3d 173, 176 (2d Cir. 2004)). Under this approach, if the "full range of conduct" covered by the state statute falls within the scope of 8 U.S.C. § 1101(a)(43), the petitioner's conviction is categorically an "aggravated felony," and the court's inquiry is complete. *Ganzhi*, 624 F.3d at 27.

Defendant argues that C.R.S. § 18-3-405.3 is not categorically "sexual abuse of a minor" under § 3509 for two reasons. First, Defendant points out that the statute criminalizes conduct between two individuals who are the same age, as well as instances where the actor is actually younger than the victim. *See Leske*, 957 P.2d at 1039 (recognizing "the plain language of the . . . statute contains no requirement that a defendant necessarily be eighteen years of age or older in order to be convicted of the

position of trust offense."). According to Defendant, the application of C.R.S. § 18-3-405.3 to cases where individuals are the same age prevents the statute from categorically being sexual abuse of a minor because C.R.S. § 18-3-405.3 covers a broader range of conduct than § 3509. The Government counters that the ages of the victim and actor are immaterial for the purposes of the aggravated felony analysis because, regardless of the actor's age, a child cannot consent to sexual contact as a matter of law.

The elements for a conviction under C.R.S. § 18-3-405.3 are that the victim is under the age of 18, and the actor is in a position of trust. Thus, unlike statutory rape statutes, there is no age requirement for the actor in C.R.S. § 18-3-405.3.[6] Likewise, § 3509 does not contain an age requirement for the perpetrator of the crime. It follows that, under § 3509, a defendant may be the same age or younger than the minor victim and still commit sexual abuse of a minor, so long as the defendant's acts fall within the prohibited range of conduct.

Furthermore, the fact that a minor victim may be the same age or older than the actor is irrelevant under both C.R.S. § 18-3-405.3 and § 3509 because, pursuant to both statutes, a minor is unable to consent as a matter of law. *See United States v. De La Cruz-Garcia*, 590 F.3d 1157, 1160 (10th Cir. 2010) (citing Colorado's sexual assault on a child statute and recognizing a "minor is *legally incapable* of granting consent") (emphasis in original). Because the age of the defendant is not an element under § 3509, the court concludes C.R.S. § 18-3-405.3 is not broader than § 3509 in this regard.

Second, Defendant argues C.R.S. § 18-3-405.3 is not categorically an "aggravated felony" because it criminalizes conduct that is purely voluntary or consensual, whereas § 3509 criminalizes involuntary conduct only. He contends that the words "employment, use, persuasion, inducement, enticement or coercion" in § 3509 all imply nonconsensual,

---

[6] C.R.S. § 18-3-405.3 is broader than statutory rape statutes in that it criminalizes conduct even if it occurs between two individuals of the same age, provided the perpetrator of the offense is in a position of trust. Indeed, even a person in a position of trust who is younger than the victim may be found guilty of the offense. For example, a seventeen year old camp counselor who sexually abuses a developmentally disabled camper who is seventeen and a half years old would be guilty of violating C.R.S. § 18-3-405.3.

commercial, or coercive conduct and do not reach consensual acts. He argues that the words "knowingly subjects" in C.R.S. § 18-3-405.3 lack the coercive element found in § 3509 and notes that the model jury instructions for C.R.S. § 18-3-405.3 do not require lack of consent as an element of a violation of that statute. In other words, Defendant contends that § 3509 addresses crimes in which the defendant forced or manipulated the child to participate in a sexual act, whereas C.R.S. § 18-3-405.3 does not necessarily require force or manipulation because it also covers voluntary and consensual conduct.

In response, the Government points out that C.R.S. § 18-3-405.3 requires that a defendant "knowingly subject" a child to a sexual act, thereby removing the possibility of a voluntary and consensual act. *See United States v. Romero-Hernandez*, 505 F.3d 1082, 1089 (10th Cir. 2007) (concluding C.R.S. § 18-3-404(1), which prohibits a perpetrator from "knowingly subject[ing]" a victim who is unable to give consent to sexual contact, is a "crime of violence" under the U.S. Sentencing Guidelines, and noting that the relevant subsection "requires merely that the perpetrator know that the victim did not consent[.]"). Moreover, by requiring that a defendant occupy a position of trust, the statute intentionally requires the defendant to be in a position of power and authority over the victim. As explained by an En Banc panel of the Colorado Supreme Court:

> In adopting the position of trust statute, the legislature focused on those instances in which a defendant has gained access to a child through the position of trust he or she holds. A person in a position of trust is more likely to be alone with a child, successfully lure a child to a place of isolation, or manipulate a child to submit to abuse or keep it a secret.

*Pellman v. People*, 252 P.3d 1122, 1127 (Colo. 2011). Thus, the Colorado legislature enacted C.R.S. § 18-3-405.3 to protect a vulnerable segment of citizens from sexual exploitation, namely children whose care is entrusted to another person.[7]

---

[7] It is the legislatures, not the courts, which are tasked with making the public policy determination of whether certain conduct constitutes a crime. *See United States v. Kimbrough*, 69 F.3d 723, 730 (5th Cir. 1995) (stating courts "must defer to the legislature's determination of whether a specific course of conduct constitutes one or more separate crimes."); *United States v. Sanderson*, 966 F.2d 184, 188 (6th Cir. 1992) (recognizing that "determining what facts are necessary to constitute a criminal act is a value choice more appropriately made in the first instance by a legislature rather than by a court.") (internal quotations and citations omitted).

The existence of the trust position coupled with a requirement that the perpetrator "knowingly subject" the victim to a sexual act removes the possibility of criminalizing voluntary, consensual conduct under C.R.S. § 18-3-405.3. *See Bohrer v. DeHart*, 943 P.2d 1220, 1226-27 (Colo. App. 1996) (rejecting defendant's contention that consent is a defense to a criminal charge of sexual assault on a child less than eighteen years of age by one in a position of trust.).

The court thus concludes that "full range of conduct" covered by C.R.S. § 18-3-405.3 falls within the scope of 8 U.S.C. § 1101(a)(43), which renders it an "aggravated felony." Having determined that ICE did not err in classifying Defendant's conviction as an "aggravated felony," Defendant was deportable under 8 U.S.C. § 1227(a)(2)(A)(iii). Because Defendant cannot establish fundamental unfairness, he fails to meet his burden under § 1326(d)(3).

In light of the court's conclusion that Defendant cannot satisfy his burden of showing fundamental unfairness under § 1326(d)(3), the court need not decide whether Defendant has satisfied the other two prongs of § 1326(d). *See United States v. Mendoza-Mata*, 322 F.3d 829, 832 (5th Cir. 2003) (concluding "[i]f the alien fails to establish one prong of the three part test, the [c]ourt need not consider the others."). The court thus DENIES Defendant's motion to dismiss the Indictment.

## CONCLUSION

For the reasons stated above, the court hereby DENIES Defendant's Motions to Dismiss the Indictment and Suppression of Evidence. (Doc. 17.)

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 20th day of October, 2011.

Christina Reiss, Chief Judge
United States District Court